# Attachment A

COAST GUARD MEDICAL MANUAL,

COMMANDANT INSTRUCTION M6000.1B

ARTICLE 1.B.3.

n. in conjunction with the MLC, providing professional oversight and establishing qualifications standards and privileging for assigned personnel, including contract, reserve and student providers;

o. assigning personnel and ensuring position and billet descriptions are accurate and that credentials and privileging requirements are met;

p. within general Coast Guard and unit guidelines, determining the priority and range of services for each beneficiary group;

q. maintaining liaison with counterparts in MTF, USTF, VA and private sector facilities;

r. preparing performance appraisals for assigned staff;

s. **reviewing and ensuring accuracy of statistical and informational reports;**

t. ensuring that appropriate training is conducted on a regularly scheduled basis;

u. ensuring active participation and compliance with the Quality Assurance Program;

v. ensuring strict adherence to current infection control procedures and standards;

w. keeping the division chief informed;

x. other duties assigned by the Chief, Health Services Division.

3. Duties of Flight Surgeons. In addition to fulfilling the general duties of medical officers, flight surgeons must:

a. thoroughly understand all operational missions of the aviation unit and participate as a flight crew member as required on MEDEVACS and to meet the requirements as set forth in the Coast Guard Air Operations Manual, COMDTINST M3710.1 (series);

b. be familiar with the operational missions of other Coast Guard units in the local area;

c. obtain a general understanding of the flight characteristics of the aircraft assigned to the unit and be thoroughly familiar with the human factors involved in pilot and crew member interaction with the aircraft;

d. be familiar with the Air Operations Manual, COMDTINST M3710.1 (series), with specific emphasis on Chapter 6, Rescue and Survival Equipment; Chapter 7, Flight Safety; and the sections of Chapter 3 (Flight Rules) dealing with protective clothing and flotation equipment;

e. ensure that aviation personnel are physically and psychologically fit for flight duty and attempt to learn of any unusual circumstances which might adversely affect their flight proficiency, this includes getting acquainted with each pilot and crew member;

f. make recommendations to the commanding officer concerning the health status of aviation personnel, and in particular, only a flight surgeon or aviation medical officer (AMO) shall issue "up" chits, except as noted in Section 3-G-2;

g.  maintain an active interest and participate in the air station flight safety program and assist the flight safety officer in planning, implementing, and coordinating the station flight safety program, and advising the command on the aeromedical aspects of flight safety;

h.  participate as the medical member of Aircraft Mishap Analysis Boards and, when so assigned, be responsible for completing the Medical Officer's Report in accordance with Chapter 2 of Safety and Environmental Health Manual, COMDTINST M5100.47 (series);

i.  be thoroughly familiar with the types and uses of personal pro-protective and survival equipment carried on aircraft at the unit [The flight surgeon shall assist in inspecting the equipment, shall advise the engineering officer and aviation survival members in maintaining and issuing the equipment, and shall be familiar with Rescue and Survival Systems Manual, COMDTINST M10470.10 (series)];

j.  actively participate in the unit aviation physiology training program to ensure that aviation personnel are capable of coping with the hazards of flight by presenting lectures and demonstrations which include, but are not limited to:

    (1)  fatigue,

    (2)  emergency medicine,

    (3)  survival,

    (4)  disorientation,

    (5)  night vision,

    (6)  reduced barometric pressure,

    (7)  crash injury avoidance,

    (8)  stress, and

    (9)  drug and alcohol use and abuse.

k.  advise the command on MEDVAC operations:

l.  ensure that HSs who participate in aviation operations maintain their knowledge and skills in aeromedical physiology, and provide refresher training lectures and demonstrations to emergency medical technicians (EMTs) and health services technicians on emergency medical procedures; and

m.  participate in a program of continuing education in aviation medicine including familiarity with information published for flight surgeons by other branches of the Armed Forces.

4.  General Duties of Dental Officers.  The principal duty of dental officers is to support the Coast Guard operational mission by determining each member's fitness for unrestricted duty on a worldwide basis.  Coast Guard dental officers are assigned to perform duties as

COAST GUARD MEDICAL MANUAL,

COMMANDANT INSTRUCTION M6000.1C

ARTICLE 3.G.

**CHAPTER 3 PHYSICAL STANDARDS AND EXAMINATIONS**

Section G. Physical Standards for Aviation.

1. Classification of Aviation Personnel.

   a. Aviation Personnel in General. Classification of Coast Guard aviation personnel is similar to that prescribed for Navy aviation personnel. The term "aviation personnel" includes all individuals who, in the performance of their duty, are required to make frequent aerial flights. Aviation personnel are divided into two classes: Class 1 and Class 2.

   b. Class 1. Class 1 consists of aviation personnel engaged in actual control of aircraft, which includes aviators, student aviators, and student flight surgeons that are chosen to perform solo flights.

   c. Class 1R. Class 1R consists of aviation personnel engaged in actual control of aircraft who:

      (1) meet Class 1 standards but are age 50 or over; or

      (2) have a waiver (temporary or permanent) of physical standards which forbids unrestricted flight. The flight restriction(s) to which the Class 1R pilot is subject will be defined by the waiver authority. In all cases, however, Class 1R aviators will fly as a dual pilot with a Class 1 aviator.

   d. Changing Classes. Except for changes in class due solely to age, individuals requiring a change in their classification for more than two months must submit the following to Commander CGPC:

      (1) SF-502, Narrative Summary, completed by a flight surgeon/aviation medical officer stating the need for the class change and whether a permanent or temporary change is requested; and

      (2) command endorsement.

   e. Class 2. Class 2 consists of aviation personnel not engaged in actual control of aircraft. This includes aviation observers, technical observers, flight surgeons, aviation medical officers, aviation MEDEVAC specialists, flight officers, aircrew members, air traffic controllers, and other persons ordered to duty involving flying.

2. General Instructions for Aviation Examinations.

   a. Object of Aviation Physical Examinations.

      (1) The examination for flying shall be limited to members of the aeronautical organization and authorized candidates. The object of an aviation physical examination is to ensure individuals involved in aviation are physically and mentally qualified for such duty, and to

remove from aviation those who are temporarily or permanently unfit because of physical or mental defect.

(2) The main objective in examining candidates for flight training is selecting individuals who can fly safely and continue to do so for at least 20 years.

(3) For designated aviators, the objective is to determine if the individual can fly safely during the next 24 months.

b.   Performance of Aviation Physical Examinations. To promote safety and to provide uniformity and completeness, an aviation physical examination must be performed by a currently qualified Flight Surgeon (FS)/Aviation Medical Officer (AMO)/Aeromedical Physician Assistant (APA) authorized by the Commandant. Only physicians or physician assistants who have successfully passed a course at a school of aviation medicine of the U. S. Armed Forces leading to the designation of "Flight Surgeon", "Aviation Medical Officer" or "Aeromedical Physician Assistant" are so authorized. Civilian physicians who were military flight surgeons and who are currently certified by the Federal Aviation Administration as aviation medical examiners may also be authorized.

c.   Scope of Aviation Physical Examination. In addition to the general service requirements specified in section 3-D, certain special requirements must be met by the various categories of individuals concerned with aviation. The extent of the examination and the physical standards vary for the several categories of aviation personnel. The term "flight or aviation physical examination" is therefore incomplete unless the character of the duty that the examinee is to perform is specified--this incomplete term shall not be used in item #16 of DD-2808 (rev Jul-01) as the purpose of the examination. Examiners shall conduct aviation physical examinations in accordance with the general procedures specified in this section and in section 3-C.

d.   Required Aviation Physical Examinations. Each individual in the Service who is assigned to duty requiring performance of frequent aerial flights, regardless of classification, must have passed an aviation physical within the preceding 24 months. In some cases, more frequent examinations are required. Aviation physical examinations are required as indicated in this section. They may also be ordered whenever needed to determine an individual's physical fitness for the type aviation duty to which assigned.

(1) Entry on Active Duty. Reserve aviation personnel who perform frequent aerial flights must have passed an aviation physical examination, commensurate with the type of duty to be performed, within the 24 months preceding active duty or active duty for training. Aviators who are not members of aviation reserve units must have

satisfactorily passed an aviation physical examination within six months immediately preceding the actual control of aircraft.

(2) Biennial. All aviation personnel, including Reservists on inactive duty for training, who will actually control aircraft or perform frequent aerial flights must obtain a biennial aviation physical examination commensurate with the type of duty to be performed. The examination is required every two (2) years after initial designation. Upon reaching age 50, the examinations become annual.

(3) Direct Commission. An aviation physical examination is required prior to direct commissioning of aviators in the Reserve. The aviator is required to meet Class I standards.

(4) Candidates for Designation as Class 1. All candidates for flight training, whether or not they are already in the Service, must pass a physical examination for flight training duty. The examination date must not precede the application date by more than 12 months.

(5) Candidates for Designation as Class 2. An approved aviation physical examination less than 24 months old is required both when applying for a Class 2 aviation training program and prior to a Class 2 designation.

(6) FAA Airmen Medical Certificate. After receiving Federal Aviation Administration (FAA) Aviation Medical Examiner (AME) training, Coast Guard flight surgeons/AMOs may request authorization from Commandant (CG-1121) to perform Second and Third Class physical examinations and issue FAA Medical Certificates to all military personnel on active duty including active duty for training. The FAA Administrator furnishes AME's with the necessary instructions, guides, and forms required for this purpose. Except in those instances where there is a military requirement for FAA certification, examination and issuance of medical certificates shall not interfere with the flight surgeon's primary duties. Whenever possible, certificates should be obtained in conjunction with a required aviation physical examination.

(7) Aircraft Accidents. Any Coast Guard member involved in a Class A or B aircraft mishap in which damage to the aircraft or injury to any crewmember occurs shall undergo a complete aviation physical examination as part of the mishap investigation. Examinations after other mishaps are left to the discretion of the flight surgeon/AMO.

(8) Quinquennial. The quinquennial examination of a Reserve aviation special duty officer must be an aviation physical examination.

(9) Separation. An aviation physical examination is not required of aviation personnel being separated from active duty. The requirements for examination are the same as those for the separation from active duty of non-aviation personnel.

e. <u>Boards</u>. Assignment to and continuation of duty involving flying is an administrative process. Except for enlisted personnel in aviation ratings, fitness to perform aviation duties is a determination independent of the determination of fitness for continued service. The process regarding physical disqualifications and waivers for aviation personnel is outlined in the Aviation Medicine Manual, COMDTINST 6410.3.

f. <u>Reporting Fitness for Flying Duties</u>. The process for reporting fitness for duty for aviation personnel is outlined in the Aviation Medicine Manual, COMDTINST 6410.3 (series).

g. <u>Reporting Aviation Physical Examinations</u>. The process for reporting Aviation Physical Examinations for aviation personnel is outlined in the Aviation Medicine Manual, COMDTINST 6410.3 (series).

3. <u>Restrictions Until Physically Qualified</u>.
The process regarding restrictions until physically qualified for aviation personnel is outlined in the Aviation Medicine Manual, COMDTINST 6410.3(series).

4. <u>Standards for Class 1</u>.

a. <u>General</u>. The physical examination and physical standards for Class 1 are the same as those prescribed in sections 3-C and 3-D of this Manual, as modified by the following subparagraphs.

b. <u>History</u>.

(1) History of any of the following is disqualifying: seizures, isolated or repetitive (grand mal, petit mal, psychomotor, or Jacksonian); head injury complicated by unconsciousness in excess of 12 hours or post traumatic amnesia or impaired judgment exceeding 48 hours; malaria, until adequate therapy has been completed and there are no symptoms while off all medication for 3 months.

(2) For persons already in the Coast Guard a complete review of their health record is most important. Flight surgeons are authorized to postpone the examination of persons who fail to present their health record at the time of examination. In exercising this prerogative, due consideration must be made in cases where access to the individual's health record is administratively impracticable.

c. <u>Therapeutics and General Fitness</u>. Note on the DD-2808 if the individual received medication or other therapeutic procedures within 24 hours of the examination. In general, individuals requiring therapeutics or who have observed lowering of general fitness (dietary, rest, emotional, etc.,) which might affect their flying proficiency shall not be found qualified for duty involving flying.

d.  Each aviation physical will have a Valsalva, SBT (Self Balancing Test), and AA (Aeronautical Adaptability) performed and noted.

e.  Height. Minimum 157.4 cm (62 inches). Maximum 198 cm (78 inches).

f.  Chest. Any condition that serves to impair respiratory function may be cause for rejection. Pulmonary function tests are recommended to evaluate individuals with a history of significant respiratory system problems.

g.  Cardiovascular System. Cardiac arrhythmia, heart murmur, or other evidence of cardiovascular abnormalities shall be carefully studied. Evidence of organic heart disease, rhythm disturbances or vascular diseases, if considered to impair the performance of flying duties, is cause for rejection.

h.  Teeth. The following are disqualifying:

(1)  Any carious teeth that would react adversely to sudden changes in barometric pressure or produce indistinct speech by direct voice or radio transmission.

(2)  Any dental defect that would react adversely to sudden changes in barometric pressure or produce indistinct speech by direct voice or radio transmission.

(3)  Fixed active orthodontic appliances require a waiver from CGPC (opm or epm). (fixed retainers are exempts).

(4)  Routine crown and temporary dental work is not disqualifying for aviation missions. Recommend that temporary crowns be cemented with permanent cement like polycarboxylate or zinc oxyphosphate cement until the permanent crown is delivered. Recommend temporary grounding of 6-12 hours after procedures. Such work may be disqualifying for deployment.

i.  Distant Visual Acuity. Distant visual acuity shall be not less than 20/200 in either eye and if less than 20/20 must be correctable to 20/20 with standard lenses. When the visual acuity of either eye is less than 20/20 correction shall be worn at all times while flying.

j.  Oculomotor Balance. The following are disqualifying:

(1)  esophoria greater than 10 prism diopters;

(2)  exophoria greater than 10 prism diopters;

(3)  hyperphoria greater than 1.5 prism diopters;

(4) prism divergence at 20 feet and 13 inches is optional. These tests shall be accomplished only on designated aviators who have sustained significant head injury, central nervous system disease, or who have demonstrated a change in their phorias.

k.   Eyes. Any pathologic condition that may become worse or interfere with proper eye function under the environmental and operational conditions of flying disqualifies. History of radial keratotomy is disqualifying.

l.   Near Visual Acuity. Uncorrected near vision (both eyes) shall be not less than 20/200 correctable to 20/20, with correction worn in multivision lenses while flying if uncorrected near vision is less than 20/40 in either eye.

m.   Color Vision. Normal color perception is required.

n.   Depth Perception. Normal depth perception is required. When any correction is required for normal depth perception it must be worn at all times.

o.   Field of Vision. The field of vision for each eye shall be normal as determined by the finger fixation test. When there is evidence of abnormal contraction of the field of vision in either eye, the examinee shall be subjected to perimetric study for form. Any contraction of the form field of 15o or more in any meridian is disqualifying.

p.   Refraction. There are no refractive limits.

q.   Ophthalmoscopic Examination. Any abnormality disclosed on ophthalmoscopic examination that materially interferes with normal ocular function is disqualifying. Other abnormal disclosures indicative of disease, other than those directly affecting the eyes, shall be considered with regard to the importance of those conditions.

r.   Ear. The examination shall relate primarily to equilibrium and the patency of eustachian tubes. A perforation or evidence of present inflammation is disqualifying. The presence of a small scar with no hearing deficiency and no evidence of inflammation, does not disqualify. Perforation, or marked retraction of a drum membrane associated with chronic ear disease, is disqualifying.

s.   Sickle Cell Preparation Test. Quantitative hemoglobin electrophoreses greater than 40% HGs is disqualifying.

5.   Standards for Class 1R.
     Physical requirements for service are the same as for Class 1, except:

     a.   Age 50 or older, or

    b. <u>Have a waiver</u> (temporary or permanent) of physical standards that forbids unrestricted flight.

6. <u>Candidates for Flight Training.</u>

    a. <u>Standards.</u> Candidates for flight training shall meet all the requirements of Class 1, with the following additions or limitations:

        (1) Cardiovascular.

            (a) Candidates with accessory conduction pathways (Wolff-Parkinson-White (WPW), other ventricular pre-excitation patterns) are CD. No waiver is recommended for candidates with this condition.

            (b) Candidates with WPW Syndrome who have had definitive treatment via Radio Frequency (RF) ablation with demonstrable non-conduction on follow-up Electrophysiologic Studies (EPS) are considered for waiver on a case-by-case basis.

            (c) Asymptomatic candidates: When incidentally noted accessory bypass tracts, proven incapable of sustained rapid conduction as demonstrated by EPS, is discovered in a candidate, the candidate (if asymptomatic), will be considered qualified. In general, EPS is not recommended in asymptomatic individuals.

        (2) Height. Candidates for Class I training must also satisfy the following anthropometric requirements: Refer to figure 3-G-1 through figure 3-G-4 for guidelines on measurements.

            (a) <u>sitting height</u>: 33 inches to 40.9 inches. Record in parentheses in Item 73, DD-2808 (SH_____), see figure 3-G-1 for proper measurements;

            (b) <u>sitting eye height</u>: 28.5 inches or greater. Record in parentheses in Item 73, DD-2808 (SEH_____), see figure 3-G-2 for proper measurements;

            (c) <u>thumb tip reach:</u> 28.5 inches or greater. Record in parentheses in Item 73, DD-2808 (TTR_____), see figure 3-G-3 for proper measurements;

            (d) <u>buttock-knee length:</u> 21 inches to 27.9 inches. Record in parentheses in Item 73, DD-2808 (BKL_____), see figure 3-G-3 for proper measurements;

            (e) <u>add:</u> sitting eye height (SEH) and thumb tip reach (TTR), 57 inches or greater. Record in parentheses in Item 73, (SEH + TTR =_____).

(3) Uncorrected distant visual acuity must be not less than 20/50 each eye and correctable 20/20 each eye. Uncorrected near visual acuity must be not less than 20/20 each eye (may be waiverable).

(4) While under the effects of a cycloplegic, the candidate must read 20/20 each eye. The following are disqualifying:

    (a) total myopia greater than (minus) -2.00 diopters in any meridian;

    (b) total hyperopia greater than (plus) +3.00 diopters in any meridian;

    (c) astigmatism greater than (minus) -0.75 diopters; (Report the astigmatic correction in terms of the negative cylinder required.)

    (d) the purpose of this cycloplegic examination is to detect large latent refractive errors that could result in a change of classes during an aviation career. Therefore, the maximum correction tolerated at an acuity of 20/20 shall be reported. Cycloplegics reported as any other acuity, e.g., 20/15 will be returned.

(5) The Coast Guard will consider sending candidates to Navy Flight School who have had photorefractive keratectomy, (anterior corneal stromal surface laser ablation with no stromal flap), and meet all of the enrollment criteria. Candidates must have demonstrated refractive stability as confirmed by clinical records. Neither the spherical or cylindrical portion of the refraction may have changed more than 0.50 diopters during the two most recent postoperative manifest refractions separated by at least one month. The final manifest shall be performed no sooner than the end of the minimum waiting period (3 or 6 months depending on the degree of preoperative refractive error). The member must have postoperative uncorrected visual acuity of at least 20/50 correctable with spectacles to at least 20/20 for near and distance vision. Detailed enrollment criteria may be obtained by contacting CGPC-opm-2.

(6) Hearing. Audiometric loss in excess of the limits set forth in the following table is disqualifying:

| FREQUENCY | 500 | 1000 | 2000 | 3000 | 4000 |
|-----------|-----|------|------|------|------|
| EITHER EAR | 30 | 25 | 25 | 45 | 55 |

(7) Personality. Must demonstrate, in an interview with the flight surgeon, a personality make-up of such traits and reaction that will indicate that the candidate will successfully survive the rigors of the flight training program and give satisfactory performance under the stress of flying.

(8) Chest x-ray. Aviation trainees must have had a chest x-ray within the past three years.

(9) Report of Medical History (DD-2807-1). In addition to the normal completion of the DD-2807-1, the following statement shall be typed in block 29 and signed by the applicant: "I certify that I do not now use, nor have I ever used, contact lens for any purpose, and that I am not aware that my uncorrected vision has ever been less than 20/50." If the applicant cannot sign this statement, include a full explanation by the examining flight surgeon, and an ophthalmology consultation.

b. Reporting.

(1) The importance of the physical examination of a candidate should be recognized not only by the examining flight surgeon but also by health services personnel assisting in the procedure and preparing the report. Candidates often come from a great distance or from isolated ships. If the examination cannot be completed in one working day, seek the commanding officer's help in making it possible for the candidate to remain available for a second working day. Careful planning should keep such cases to a minimum. If a report, upon reaching Commandant (CG-112), is found to be incomplete and must be returned, the candidate will suffer undue delay in receiving orders and in some cases will be completely lost to the Coast Guard as a candidate. The preparation of the DD-2808 in the case of a candidate requires extreme care by all concerned.

(2) In a report of the examination of a candidate, rigid adherence to set standards is expected. The examining officers are encouraged to use freely that portion of the report that provides for "remarks" or "notes." Comments made under "remarks" are the examiner's opinion. Information from any source may be molded into an expression of professional opinion. A final recommendation of the examiner must be made. When such recommendation is not consistent with standards set by Commandant (CG-11) the examiner shall note that fact on the form under "remarks" or "notes" and a reasonable explanation made. When space on an DD-2808 is inadequate, use a Continuation Sheet (SF-507).

7. Requirements for Class 2 Flight Officers.

a. Flight Officer Candidates. Flight officer candidates shall meet the standards for Class 1 except that depth perception is not required.

b. Designated Flight Officers. Flight officers shall meet the standards for flight officer candidate except that uncorrected distant visual acuity must be not less than 20/400 in either eye and shall be correctable to 20/20.

8. Requirements for Class 2 Aircrew.

a. Aircrew Candidates. Unless otherwise directed by Commander CGPC-epm, personnel will not be permitted to undergo training leading to the designation of aircrewmen unless a flight surgeon/aviation medical officer

Chapter 3. G. Page 9

has found them physically qualified for such training. Should it be desirable, for exceptional reasons, to place in training a candidate who does not meet the prescribed physical standards, the commanding officer may submit a request for a waiver, with the DD-2808 and DD-2807-1, to Commandant (CGPC), justifying the request. Aircrew candidates shall meet the standards for Class 1, except that minimum height is 152.5 cm/60 inches and uncorrected distant visual acuity must be not less than 20/100 each eye, correctable to 20/20 each eye. Cycloplegic refraction and anthropometric measurements are not indicated. A chest x-ray is required within the previous 3 years.

    b.   Designated Aircrew. Aircrew shall meet the standards for Class 1, except the minimum height is 152.5 cm/60 inches.

9.   Requirements for Class 2 Medical Personnel.

    a.   Flight Surgeon (FS)/Aviation Medical Officer (AMO)/Aeromedical Physician Assistants (APA), FS Candidates. While assigned to a Duty Involving Flight Operations billet, FS/AMOs/APAs shall meet the standards for Designated Flight Officer, except that minimum height is 152.5 cm (60 inches).

    b.   Aviation MEDEVAC Specialists (AMS)/AMS Candidates. Aviation MEDEVAC Specialists (Health Services technicians (HS) who are assigned to flight orders), shall meet the standards for Designated Flight Officer, except that minimum height is 152.5 cm (60 inches).

10.   Requirements for Class 2 Technical Observers.
The term "technical observer" is applied to personnel who do not possess an aviation designation but who are detailed to duty involving flying. The examination shall relate primarily to equilibrium and the patency of eustachian tubes. They shall meet the standards prescribed for general duty. These personnel are not required to undergo a physical examination for flying provided a complete physical examination, for any purpose, has been passed within the preceding 60 months and intervening medical history is not significant. The physical examination need not be conducted by an FS/AMO. Technical observers who are required to undergo egress training must have a current (general purpose) physical examination and a status profile chit indicating "OK DIF/Dunker/Chamber."

11.   Requirements for Class 2 Air Traffic Controllers.
Air traffic controllers, tower controllers, and ground control approach operators shall meet the general physical standards for Class 1, except:

    a.   Articulation. Must speak clearly and distinctly without accent or impediment of speech that would interfere with radio communication. Voice must be well modulated and pitched in medium range. Stammering, poor diction, or other evidence of speech impediments that become manifest or aggravated under excitement are disqualifying.

COAST GUARD MEDICAL MANUAL,

COMMANDANT INSTRUCTION M6000.1C

ARTICLE 4.A.1.a.(6).

## CHAPTER 4 HEALTH RECORDS AND FORMS

Section A Health Records.

1. Purpose and Background.

   a. Introduction. The health record is the chronological medical and dental record of an individual while a member of the Coast Guard or the Coast Guard Reserve. The primary reasons for compiling a health record are listed below.

      (1) To develop an accurate clinical history that will help in future diagnosis and treatment.

      (2) To protect the Government, the individual concerned, and the individual's dependents. It may be used in adjudicating veterans claims by making permanently available in a single record all entries relative to physical examinations, medical and dental history, preliminary to entry and throughout the individual's entire Coast Guard career. This is accomplished by opening or maintaining medical and dental records:

         (a) Upon entry into the Service.

         (b) As required to maintain concise, yet complete, records during period of service.

         (c) At time of separation.

      (3) To facilitate appraisal of the physical fitness or eligibility for benefits by making selected, necessary information contained in the health record available to Coast Guard selection boards, disability evaluation system, Board of Correction of Military Records, for income tax purposes, and for claims to the Department of Veterans Affairs.

      (4) To furnish a basis for collecting statistical information.

      (5) To identify deceased persons through dental records when other means are inadequate.

      (6) To facilitate communication among health care providers, utilization managers, quality assurance and medical records personnel.

   b. Value of accuracy. As an individual's service career progresses, the health record increases in value to the Government, the individual, and the individual's family and dependents. Accuracy, therefore, is of the utmost importance in making entries, including entries regarding minor ailments or injuries which appear trivial at the time, but which must be recorded to protect the Government and the individual.

2. Contents of the Health Record.
   Each member's health record shall consist of CG-3443 (Health Record Cover) with medical records and dental records arranged as follows:

COAST GUARD MEDICAL MANUAL,

COMMANDANT INSTRUCTION M6000.1C

ARTICLE 4.A.3.c.

(1) U.S. Coast Guard Dental Record, CG-3443-2. If needed a Sensitivity Sticker, CG-5266 shall be placed on outside of Dental Record. All forms in the Dental Record shall be arranged in the following order (a) being the top and (d) being the bottom. Additionally, the forms should be grouped by date with the most recent on top.

    (a) Dental Health Questionnaire  CG-5605.

    (b) Health Record – Dental (Continuation) * SF-603A.

    (c) Health Record - Dental SF-603.

    (d) Request for Anesthesia SF-522.

(2) International Certificate of Vaccination PHS-731 *(This form is optional and only required when needed).

        Notes:
        * --- When required

g. Filing forms. File forms of the same number in their assigned sequence, with the most recent on top of each previous form, e.g., SF-600 dated 94/02/15 is filed on top of SF-600 dated 94/02/14.

h. Recording dates. Record all dates on the Health Record Cover in the following sequence (all numerals):  year/month/day (e.g., 51/02/07).

i. Review reports before filing. Reports, including laboratory, X-ray, and consultations, shall be reviewed and initialed by the responsible MO, DO, PA/PYA or NP before they are filed in the health record.

j. The health record is a legal document. As such, legibility of all information is essential. Patient ID information shall be typed, printed, or stamped. All entries shall be neat and legible. All signatures shall be accompanied by the stamped or typed name and rank of the practitioner.

3. Custody of Health Records.
The following are the general responsibilities for keeping health records.

a. Security. Health records are the property of the Federal government and must be handled in accordance with the provisions of the HIPAA Regulations, the Privacy Act of 1974 and the Freedom of Information Act. Guidance in this area is contained in the Coast Guard Freedom of Information and Privacy Acts Manual, COMDTINST M5260.3 (series). Health record custody, privacy, confidentiality and security requirements are applicable to all documents and electronic files that contain protected health information, whether or not filed in the health record, such as Inpatient Medical Records and mental health treatment records. Disposal of all health record documents shall be in accordance with Coast Guard

Information and Life Cycle Management Manual, <u>COMDTINST M5212.12</u> (series).

(1) Since health records contain personal information of an extremely critical or sensitive nature, they are considered class III records requiring maximum security (high security locked cabinets or areas).

(2) Except as contained in HIPAA and The Coast Guard Freedom of Information and Privacy Acts Manual, <u>COMDTINST M5260.3 (series)</u> the information contained in health records shall not be disclosed by any means of communication to any person, or to any agency unless requested in writing by or with the prior written authorization of the individual to whom the record pertains. It is the requestor's responsibility to obtain the written authorization.

a.  <u>Custody.</u> Health records shall be retained in the custody of the Chief, Health Services Division of the unit to which the individual is attached. At units where there is no medical officer attached, the health record will become the responsibility of the executive officer in accordance with Coast Guard Regulations, <u>COMDTINST M5000.3 (series)</u>, who may delegate custody to the senior health services department representative. At units without a health services technician the custody of the health record is the responsibility of the unit's executive officer. Maintenance of these health records may be delegated to health services personnel of another unit (e.g., groups, support centers, etc.). <u>At no time shall individual members keep or maintain their own health record.</u> If there is a need to check out a health record for an appointment at another health care facility, the health record custodian shall have the member complete and sign the Health Record Receipt Form (NAVMED 6150/7). The health record custodian shall place the record in an envelope, hand it to the member, and tell the member to return the record as soon as possible following the appointment. The envelope used for record transportation shall bear a printed request reminding outside providers to treat the contents as confidential and requesting providers to include copies of their consultations or case notes for placement in the health record. The responsibilities contained herein are also applicable to Reserve components.

b.  <u>Patient's right to examine record.</u> Individuals may examine their own health record in the presence of a health services department representative, providing:

(1) Such examination does not interrupt the unit's scheduled mission.

(2) There is no information contained therein that would be detrimental to the individual's mental well-being, as determined by the member's attending physician.

c.  <u>Disclosure of information.</u> The protected health information necessary for fitness-for-duty determinations, status for deployment and special

operational duty, separations from duty, convalescent leave recommendations, inpatient admission and casualty notifications, and other routine disclosures for the military mission, is subject to inspection by the commanding officer, their delegate designated in writing, duly appointed counsel in the case of formal hearings, or duly appointed Coast Guard officials who are conducting authorized investigations. Such inspections will be conducted in the presence of a health services department representative to aid in the interpretation of health information.

d. Signatures and stamps. Health services personnel making entries in health records shall ensure all entries, including signatures, are neat and legible. Signature information shall include the stamped or printed name and grade or rate of the signer. Facsimile signature stamps may only be used on the PHS-731 and the SF-601.

e. Erroneous entry. If an erroneous entry is made in a health record, the author of the entry shall draw a diagonal line through the complete entry, make an additional entry showing wherein and to what extent the original entry is in error, and initial clearly next to the correction.

f. Responsibility of record. Health services personnel are responsible for the completeness of the entries made on any medical or dental form while the health record is in their custody. No sheet shall be removed from the health record except under conditions specified in this Manual.

g. Member's authorization. Members are not authorized to write in, alter, remove documents from, or otherwise change their health record or its contents. Request for changes to health record contents shall be made in writing in accordance with procedures contained in the HIPAA Privacy Regulation and in Chapter 16 of the Coast Guard Freedom of Information and Privacy Acts Manual, COMDTINST M5260.3 (series).

4. Opening Health Records.

a. General.

(1) A health record will be opened at the recruiting office for each individual upon entering the Coast Guard.

(2) A new health record will be opened upon reenlistment of personnel with prior USCG service when such enlistment is not effected the day following discharge. In all cases, request the individual's health record covering prior military service from the National Personnel Records Center, St. Louis, MO.

(3) Other specific occasions for opening a Health Record.

| OCCASSION | OPENED BY |
|---|---|
| Officer appointed from civilian | First duty station |

Chapter 4. A. Page 6

COAST GUARD MEDICAL MANUAL,

COMMANDANT INSTRUCTION M6000.1C

ARTICLE 10.A.4.a.

i. <u>Physician assistant.</u> If a physician assistant has clinical privileges at a local DoD facility, he or she may use its prescription form to write prescriptions to be filled at that facility, provided the form contains the statement "To be filled only at [insert designated DoD facility]."

j. <u>Responsibility of prescribing facility.</u> The prescriber's facility has the responsibility to procure and dispense all medications its staff members (including in-house contract prescribers) prescribe. In the rare event a patient must carry a prescription elsewhere for dispensing, the prescriber shall write the facility's name in addition to the other required information on the form (i.e., facility address/phone number, provider's or clinic's DEA number, date of prescription).

k. <u>Providers are tasked with the cost effective use of medications.</u> The DoD Basic Core Formulary (BCF) serves as the basis of all Coast Guard clinics' formulary. Pharmaceuticals considered as high dollar and/or for specific patients shall be considered Special Order Medications. A Special Order Medication is defined as: a medication for a specific patient for which the provider has completed a Special Order Medication Request form submitted to the pharmacy and reviewed during the next convening clinic Pharmacy and Therapeutics Committee meeting; a medication chosen due to a patient's treatment failure to a BCF drug in the same therapeutic category as the special order medication; and/or, a medication not therapeutically available from the BCF and clearly indicated as a medical necessity for a specific patient. In the rare event a patient must carry a prescription elsewhere for dispensing, the prescriber shall include the facility's name, facility's address/phone number, provider's or clinic's DEA number, and date of prescription on the prescription blank along with all other pertinent information in order for the patient to have the prescription filled outside of the clinic.

4. <u>Prescribing in the Medical Record.</u>

a. <u>At the present, all CG pharmacies are migrating to CHCS/PGUI and POE as per Chapter 14 of this Manual.</u> That is the preferred method of prescribing for CG providers. However, until this process is fully implemented, an acceptable alternative remains prescribing using the Medical Record. At all clinics and sickbays, prescribe medications on an SF-600 in the medical record, or when appropriate, SF-558, Emergency Care and Treatment. The medical record thus becomes a more comprehensive repository for all patient health information and also ensures the pharmacy staff has access to the necessary clinical information (age, weight, allergies, lab values, vital signs, etc.) to provide complete pharmaceutical care. In clinics that maintain dental records separately, the dental staff may use prescription forms or write prescriptions on a SF-603A.

b. <u>Procedures.</u>

Chapter 10. A. Page 7

COAST GUARD MEDICAL MANUAL,

COMMANDANT INSTRUCTION M6000.1C

ARTICLE 10.A.4.a.

i.   Physician assistant. If a physician assistant has clinical privileges at a local DoD facility, he or she may use its prescription form to write prescriptions to be filled at that facility, provided the form contains the statement "To be filled only at [insert designated DoD facility]."

j.   Responsibility of prescribing facility. The prescriber's facility has the responsibility to procure and dispense all medications its staff members (including in-house contract prescribers) prescribe. In the rare event a patient must carry a prescription elsewhere for dispensing, the prescriber shall write the facility's name in addition to the other required information on the form (i.e., facility address/phone number, provider's or clinic's DEA number, date of prescription).

k.   Providers are tasked with the cost effective use of medications. The DoD Basic Core Formulary (BCF) serves as the basis of all Coast Guard clinics' formulary. Pharmaceuticals considered as high dollar and/or for specific patients shall be considered Special Order Medications. A Special Order Medication is defined as: a medication for a specific patient for which the provider has completed a Special Order Medication Request form submitted to the pharmacy and reviewed during the next convening clinic Pharmacy and Therapeutics Committee meeting; a medication chosen due to a patient's treatment failure to a BCF drug in the same therapeutic category as the special order medication; and/or, a medication not therapeutically available from the BCF and clearly indicated as a medical necessity for a specific patient. In the rare event a patient must carry a prescription elsewhere for dispensing, the prescriber shall include the facility's name, facility's address/phone number, provider's or clinic's DEA number, and date of prescription on the prescription blank along with all other pertinent information in order for the patient to have the prescription filled outside of the clinic.

4.   Prescribing in the Medical Record.

   a.   At the present, all CG pharmacies are migrating to CHCS/PGUI and POE as per Chapter 14 of this Manual. That is the preferred method of prescribing for CG providers. However, until this process is fully implemented, an acceptable alternative remains prescribing using the Medical Record. At all clinics and sickbays, prescribe medications on an SF-600 in the medical record, or when appropriate, SF-558, Emergency Care and Treatment. The medical record thus becomes a more comprehensive repository for all patient health information and also ensures the pharmacy staff has access to the necessary clinical information (age, weight, allergies, lab values, vital signs, etc.) to provide complete pharmaceutical care. In clinics that maintain dental records separately, the dental staff may use prescription forms or write prescriptions on a SF-603A.

   b.   Procedures.

COAST GUARD MEDICAL MANUAL,

COMMANDANT INSTRUCTION M6000.1C

ARTICLE 13.H.4.

## CHAPTER 13 QUALITY IMPROVEMENT

Section H. Monitoring and Evaluation Program

1.  Background
    Monitoring and Evaluation (M&E) is an on-going program that examines
    important areas of clinical care and assesses how well the facility provides that
    care. Evaluation of current care practices is the "heart" of quality assurance, a
    process of continuously seeking areas of potential improvement in the health
    care delivery system. Participants identify areas of care needing improvement,
    implement actions to improve care, and continually monitor these areas to
    ensure the improvements are effective and the quality of care satisfactory.

2.  Responsibilities.

    a.  Commandant (CG-1122) will monitor and update the M&E program as
        appropriate.

    b.  Commander, Maintenance and Logistics Commands (k) shall review each
        facility's M&E log during Quality Assurance site surveys.

    c.  Unit QI Coordinators shall ensure the Quality Improvement Focus Group
        (QIFG) performs on-going M&E according to schedule. They shall retain
        logs or their equivalent on file for three years for MLC QA site survey
        teams to review.

3.  Implementation.
    The Monitoring and Evaluation Report Form (Figures 13-H-1) is the basic
    instrument documenting Coast Guard clinics' M&E. Each clinic will complete
    a separate form for each aspect of care monitored.

4.  Monitoring and Evaluation Process.

    a.  Monitoring. Units may select any appropriate exercise from the M&E QIIG
        each quarter, or develop their own exercises to address unit-specific issues.
        Units must record exercises they developed on Figures 13-H-1, and obtain
        cognizant MLC (k) approval. All selected exercises must address high-risk,
        high-volume, or problem-prone clinic procedures.

    b.  Submit M&E Reports to the QIFG prior to the last work day of each
        quarter. Therefore, start collecting data for each exercise at the beginning
        of each quarter.

    c.  Follow-Up Reports.

        (1) Studies Meeting Thresholds. The facility must follow up each initial
            M&E Report in 6 months with a follow-up report (Figure 13-H-1,
            Section 8).

Chapter 13. H. Page 1

(2) <u>Studies Not Meeting Thresholds</u>. The facility must produce a follow-up report 3 months after the initial report, and every 3 months thereafter until it meets that threshold(s).

d. <u>Use the M & E Data Collection Log, CG-5544</u> (Figure 13-H-2) to evaluate health records or other information sources for compliance with the indicator criteria. Record each record reviewed as meeting or not meeting the indicator. Retain completed logs on file for three years for MLC QA site survey teams to review.

5. <u>Monitoring and Evaluation Report Forms</u>.
(Figure 13-H-1). M&E report forms contain ten (10) sections: Sections 1 through 7 on the front and Sections 8 through 10 on the back.

a. <u>Aspect of Care (Section 1)</u>. If the M&E program is to be meaningful, it should focus on clinical issues that have the greatest potential to affect our patients: high-volume, high-risk, or problem-prone aspects of care.

b. <u>Clinical Indicator (Section 2)</u>. A component of care which shall be measured to determine compliance with standards. Commandant (CG-1122) establishes clinical indicators with suggestions from MLC (k) and the professional staff at all clinics.

c. <u>Thresholds for Evaluation (Section 3)</u>. Evaluate compliance with indicator criteria. If the evaluation does not meet a threshold, then the QIFG or its designee(s) must investigate the aspects of care and recommend specific action(s) for improvement.

d. <u>Data Collection Methodology (Section 4)</u>. M&E exercises data collection processes are designed to be simple. Any staff member can collect the data. One method is to review clinical records for specific indicator criteria, which are assessed as either "met" or "not met" and recorded accordingly. The "not met" column on the Data Collection Log allows the data collector to identify the specific unmet criteria, so follow-up action can be started.

e. <u>Evaluation Report (Section 5)</u>. Calculate the percentage of reviewed cases that meet and do not meet the indicator criteria and enter results

f. <u>Recommended Action (Section 7)</u>. The QIFG must act on completed M&E Reports. If the M&E does not meet a threshold, the QIFG must recommend action(s) to improve this aspect of care. Action specifically taken to improve an indicator is necessary, (Note: Follow-up in three months is not a corrective action).

g. <u>Follow-Up Reports (Sections 8-10)</u>. Generate either 3 or 6 months after the initial report by completing Section 8 on the M&E Report Form reverse. If possible, the same person responsible for the initial report should prepare