UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| WILLIE CACHO, M.D., Commander, U.S. Public Health Service, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 06-00292 (ESH) |
| MICHAEL CHERTOFF, Secretary, Department of Homeland Security, | ) ) ) ) | |
| Defendant. | ) ) | |

## REDACTED MEMORANDUM OPINION

Plaintiff Willie Cacho, M.D., a medical doctor for the United States Coast Guard, is suing Michael Chertoff in his official capacity as Secretary of the Department of Homeland Security. Plaintiff claims to have suffered adverse effects when, in violation of the Privacy Act of 1974, 5 U.S.C. § 552a (2006), a Coast Guard officer disclosed information from plaintiff's medical records to other Coast Guard officers who had no "need to know." For the reasons explained herein, the Court will deny defendant's motion to dismiss but grant defendant's alternative motion for summary judgment.

### BACKGROUND

Plaintiff is a medical doctor in the United States Public Health Service, assigned and attached to the Coast Guard. (Def.'s Stmt. of Mat. Facts Not in Dispute ["Def.'s Stmt."] ¶ 1; Pl.'s Resp. to Def.'s Stmt. of Facts Not in Dispute ["Pl.'s Stmt."] ¶ 1.) In November 1999, plaintiff became the flight surgeon for Air Station Miami. (Def.'s Stmt. ¶ 2; Pl.'s Stmt. ¶ 2.) A flight surgeon is a medical doctor who meets special criteria and is responsible for ensuring

personnel's fitness for flight duty, as well as for addressing other flight-related medical issues. (*See* Def.'s Ex. A ["Med. Man."] at art. 1.B.3(e); Def.'s Stmt. ¶ 3; Pl.'s Stmt. ¶ 3.) Like pilots and other aviation personnel, flight surgeons can be "grounded" for certain medical conditions or the use of certain medications. (Def.'s Stmt. ¶¶ 5–6; Pl.'s Stmt. ¶¶ 5–6.) Flight surgeons must report their potentially disqualifying conditions and medications. (Def.'s Stmt. ¶ 7; Pl.'s Stmt. ¶ 7.) In some instances, however, a flight surgeon suffering from a potentially disqualifying condition or taking a potentially disqualifying medication may remain flight-eligible by obtaining a medical waiver. (Def.'s Stmt. ¶ 7; Pl.'s Stmt. ¶ 7.)

While at Air Station Miami, plaintiff had a medical condition and took a prescription medication that, absent a waiver, would have at least temporarily disqualified him from flight status. (Def.'s Stmt. ¶ 10; Pl.'s Stmt. ¶ 10.) [Redacted.] (*See* Def.'s Ex. I ¶ 3; DD Form 2807-1 § 30 (filed under seal as Document No. 29).) Similarly, [redacted], plaintiff omitted the fact of his medical condition and his use of medication [redacted]. (*See id.* §§ 8, 23, 24, 29.) Indeed, until the events giving rise to the present dispute, plaintiff disclosed neither his medical condition nor his use of medication to any superior officer, and he served as flight surgeon without first seeking the necessary medical waiver. (*See* Def.'s Stmt. ¶ 15; Pl.'s Stmt. ¶ 15.)

Problems arose in June 2004, when plaintiff called a meeting with Air Station Miami's chief pharmacist, Commander Alan Sokolowski, to discuss concerns about Commander Sokolowski's job performance. (Pl.'s Ex. 8 ["Cacho Decl."] ¶ 4.) Before the meeting, a noncommissioned officer witnessed Commander Sokolowski threaten plaintiff with retaliation if plaintiff took action against him (*i.e.*, by giving him an unfavorable Commissioned Officer Effectiveness Report ("COER")). (*See* Pl.'s Ex. 2 at 1; Cacho Decl. ¶¶ 5, 7.) The parties agree

that, at the time, Commander Sokolowski knew about plaintiff's medical condition and use of medication. (*See* Opp. at 10, 21; Reply at 6.) Plaintiff contends that Commander Sokolowski also knew plaintiff had not disclosed his health problems or obtained the necessary medical waiver. (Pl.'s Stmt. ¶¶ 10, 13.)

Shortly after plaintiff's meeting with Commander Sokolowski, plaintiff was placed on routine temporary duty aboard the Coast Guard Cutter Eagle. (*E.g.*, Cacho Decl. ¶ 6.) In plaintiff's absence, Commander Stanley Gordon served as both the clinic's quality assurance coordinator, and the acting chief for the clinic and the air station's Health Services Division. (Def.'s Stmt. ¶ 16; *see* Pl.'s Stmt. ¶ 16 (not disputing this fact).) Commander Gordon directed Commander Sokolowski to complete a quarterly quality assurance exercise, "Monitoring and Evaluation of Health Records for Proper Procedures for Controlled Substance Prescriptions" ("M. & E."), pursuant to Article 13.H.4. of the Coast Guard Medical Manual. (Def.'s Stmt. ¶ 8; Pl.'s Stmt. ¶ 8.) The M. & E. required a review of individual medical records, and plaintiff's medical record met the criteria for review. (Def.'s Stmt. ¶ 9; *see* Pl.'s Stmt. ¶ 9 (agreeing that Commander Sokolowski was "authorized and required to review" certain portions of plaintiff's medical record).)

Plaintiff alleges that, although his medical record qualified for M. & E. review, Commander Sokolowski was only authorized to review two specific forms (*i.e.*, SF600 and SF603). (*See* Pl.'s Stmt. ¶¶ 9, 11.) While performing the M. & E. review, or perhaps even earlier, Commander Sokolowski reviewed additional forms. (*See* Def.'s Stmt. ¶¶ 10, 13; Pl.'s Stmt. ¶¶ 10, 13.) The additional forms revealed that plaintiff had not disclosed his health condition or his use of medication. (*See id.*)

3

Commander Sokolowski informed Commander Gordon and Lieutenant Jarvi of the omissions he had discovered. (Def.'s Stmt. ¶ 14; Pl.'s Stmt. ¶ 14.) Both Commander Gordon and Lieutenant Jarvi emailed plaintiff to inform him of their conversations with Commander Sokolowski. (Cacho Decl. ¶ 7.) Commander Gordon warned plaintiff, "[redacted]." (*See* Pl.'s Ex. 3 at 1.)

Shortly after learning about Commander Sokolowski's conversations with Commander Gordon and Lieutenant Jarvi, plaintiff emailed Commander Mary Fong (of the Health and Safety program office at the Coast Guard's headquarters) and Commander Patrick Marshall (of the Health and Safety program office at Maintenance and Logistics Command). (Def.'s Stmt. ¶ 15; Pl.'s Stmt. ¶ 15.) In his email, plaintiff disclosed his health problems for the first time to a superior and explained his intention to apply for a medical waiver. (Def.'s Stmt. ¶ 15; Pl.'s Stmt. ¶ 15.) In addition, plaintiff alleged that Commander Sokolowski had violated the Privacy Act and the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. No. 104-191, 110 Stat. 1936 (codified in relevant part at 42 U.S.C. §§ 1320d to 1320d-8), which prohibits both the improper disclosure of individually identifiable health information and the improper acquisition of such information. (Def.'s Stmt. ¶ 15; Pl.'s Stmt. ¶ 15.)

The Health and Safety program office notified plaintiff's commanding officer, Captain Keith Taylor, about plaintiff's email. (Def.'s Stmt. ¶ 18; Pl.'s Stmt. ¶ 18.) Captain Taylor then called Commander Gordon, Lieutenant Jarvi, and Commander Sokolowski into his office to discuss the matter with him and his executive officer, Commander Michael Andres. (Def.'s Stmt. ¶ 18; Pl.'s Stmt. ¶ 18.)

Thereafter, the Coast Guard initiated multiple administrative actions, some of which

4

addressed Commander Sokolowski's conduct and others of which addressed plaintiff's health problems and his failure to disclose them. (Def.'s Stmt. ¶ 19; Pl.'s Stmt. ¶ 19.) The Coast Guard determined that Commander Sokolowski had committed a HIPAA violation warranting "[a]ppropriate . . . disciplinary action." (*E.g.*, Pl.'s Ex. 4 at 2.) Based on plaintiff's health problems and nondisclosure, the Coast Guard also determined that plaintiff had an "unsatisfactory aeronautical adaptability;" directed him to repay the "aviation career incentive pay" he had received from November 2003 through July 2004; ordered him transferred to the Coast Guard Training Center in Cape May, New Jersey; formally revoked his designation as flight surgeon; and gave him an adverse COER. (Cmpl. ¶¶ 24, 25, 26, 28, 29; Def.'s Mem. in Supp. at 8.)

On February 17, 2006, plaintiff filed suit alleging that Commander Sokolowski's disclosures to Captain Taylor, Commander Andres, and "other individuals" violated the Privacy Act. (*See* Cmpl. ¶¶ 12–13.) After conducting a scheduling hearing and with the consent of both parties, the Court ordered discovery of documents related to the Coast Guard's investigations of Commander Sokolowski's conduct. *See Cacho v. Chertoff*, Minute Entry (D.D.C. June 28, 2006). Pursuant to the Court's order, defendant provided documents from which plaintiff learned that, "well before" discussing plaintiff's situation with Commander Gordon and Lieutenant Jarvi, [redacted]. (*E.g.*, Opp. at 21; *see* Pl.'s Ex. 7 at 1.) [Redacted.] (*See id.*) With the benefit of the documents that defendant provided, plaintiff now argues that Commander Sokolowski violated the Privacy Act by his disclosures to Captain Taylor, Commander Andres, Lieutenant Jarvi, Commander Gordon, and [redacted]. Plaintiff seeks monetary damages (presumably under Section 552a(g)(4)), as well as reasonable attorney's fees and costs under

Section 552a(g)(2)(B).  (*See* Cmpl. ¶ 46.)

## ANALYSIS

**I.    Standard of Review**

Defendant moves for dismissal on the ground that plaintiff has failed to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).[1]  In the alternative, defendant moves for summary judgment.  Fed. R. Civ. P. 56.  Having considered supplemental documents and declarations from both parties, the Court must analyze defendant's motion as one for summary judgment.  *See, e.g.*, *Harris v. Attorney Gen.*, 400 F. Supp. 2d 24, 26 (D.D.C. 2005) ("The Court has considered declarations outside of the pleadings and thus treats the motion as one for summary judgment.  Both parties were given a reasonable opportunity to submit materials outside the pleadings, as evidenced by the submission of declarations from both sides.  Further, an opportunity was afforded to each party to respond to the other's submissions.").

A motion for summary judgment must be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A court must "regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor."  *Harris*, 400 F. Supp. 2d at 26 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  However, a mere "scintilla of

---

[1] Without citing any legal authority or offering any supporting arguments, defendant also moves this Court to dismiss plaintiff's case for lack of subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  The D.C. Circuit has made clear that a federal district court has jurisdiction over a plaintiff's Privacy Act claim "[u]nless 'the alleged claim . . . clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction,' or [is] 'wholly insubstantial and frivolous.'"  *Kleiman v. Dept. of Energy*, 956 F.2d 335, 339 (D.C. Cir. 1992) (alteration in original) (quoting *Bell v. Hood*, 327 U.S. 678, 682–83 (1946)).  Accordingly, the Court will deny defendant's motion to dismiss insofar as defendant bases the motion on Federal Rule of Civil Procedure 12(b)(1).

evidence" in support of the non-movant's position does not preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is warranted if the non-movant fails to offer "evidence on which the jury could reasonably find" in his favor. *Id.*

II.     *Prima Facie* **Claim under the Privacy Act**

"The [Privacy] Act gives agencies detailed instructions for managing their records and provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with the requirements." *Doe v. Chao*, 540 U.S. 614, 618 (2004). "Subsection (g)(1) recognizes a civil action for agency misconduct fitting within any of four categories . . . and then makes separate provision for the redress of each." *Id.* A Privacy Act claim for monetary damages based on improper disclosure - - which arises under the fourth, "catchall" category codified at Section 552a(g)(1)(D) - - has four elements: "1) the disclosed information is a 'record' contained within a 'system of records'; 2) the agency improperly disclosed the information; 3) the disclosure was willful or intentional; and 4) the disclosure adversely affected the plaintiff." *Logan v. Dept. of Veterans Affairs*, 357 F. Supp. 2d 149, 154 (D.D.C. 2004). In addition, any plaintiff claiming an improper Privacy Act disclosure must allege actual damages. *See, e.g.*, *Doe*, 540 U.S. at 618–27 (explaining the reasons for this rule). The burden of proof lies with the plaintiff. *See Reuber v. United States*, 829 F.2d 133, 141 (D.C. Cir. 1987) (explaining that "except when [a] plaintiff seeks *disclosure* of records, 'the ordinary rule imposing the burden of proof on the plaintiff should apply'" (quoting *Mervin v. FTC*, 591 F.2d 821, 827 (D.C. Cir. 1978) (per curiam))).

Notably, a plaintiff cannot establish a *prima facie* claim under the Privacy Act simply by showing that the agency official who disclosed a protected record should never have accessed the

7

record in the first place. Of course, an agency official's authority to access a protected record will sometimes become relevant in a Privacy Act case, when the defendant agency asserts that disclosure of the protected record was permissible because the officers or employees to whom the record was disclosed had "a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). What matters then is the "need to know" of the agency official who *received* the disclosure, not the authority of the agency official who *made* the disclosure. *See, e.g.*, OMB Guidelines, 40 Fed. Reg. 28,948, 28,954 (July 9, 1975) ("[T]he *recipient* officer or employee must have an official 'need to know.'" (emphasis added)).

      Plaintiff is therefore incorrect when he argues that "[a] *prima facie* claim under the Privacy Act . . . turn[s] on . . . whether [Commander] Sokolowski personally had a need to know the information [from plaintiff's medical record] in the performance of his duties." (Surreply at 2.) Consistent with this misunderstanding of the statute, plaintiff proceeds to argue at length that, as a mere pharmacist, Commander Sokolowski lacked the authority to review plaintiff's entire medical record. (*See* Opp. at 14–20, 24; Surreply at 3–5.) In addition, plaintiff repeatedly emphasizes not only that Commander Sokolowski had a retaliatory motive for *disclosing* his health problems and failure to report them, but that Commander Sokolowski had a retaliatory motive for *reviewing* his medical record in the first place. (*See, e.g.*, Opp. at 8, 22–23; Surreply at 3.)

      In urging the Court to consider whether Commander Sokolowski had a need to access plaintiff's medical record, plaintiff cites only one case - - *Bigelow v. Department of Defense*, 217 F.3d 875 (D.C. Cir. 2000). (*See* Surreply at 2–3.) *Bigelow*, however, is inapposite. In *Bigelow*, a U.S. Army colonel, having heard allegations of the plaintiff's misconduct, requested the

8

plaintiff's personnel security file. 217 F.3d at 876. The colonel reviewed the file, confirmed his suspicions of the plaintiff's misconduct, and reported the plaintiff to the Air Force. *Id.* As a result of the colonel's actions, the plaintiff was relieved of his duties at the Office of the Joint Chiefs of Staff. *Id.* Without challenging the colonel's disclosure *to the Air Force*, the plaintiff claimed that the Department of Defense had violated the Privacy Act by disclosing his personnel security file *to the colonel*. *See id.* The district court awarded summary judgment for the government. *Id.* On appeal, the D.C. Circuit framed the key question as "whether [the colonel], as an officer of the agency maintaining the file, had 'a need for the [plaintiff's] record in the performance or [his] duties.'" *Id.* (last alteration in original) (quoting 5 U.S.C. § 552a(b)(1)). In other words, the Court focused on whether there was a need to know on the part of the agency official who had *received* the contested disclosure of the plaintiff's protected record. Concluding that the colonel indeed had a need to know, the Court upheld summary judgment for the agency. *See id.* at 878.

Although *Bigelow* does not support plaintiff's view that his Privacy Act claim hinges on Commander Sokolowski's need to access his medical record, defendant correctly acknowledges that Commander Sokolowski's need to access plaintiff's medical record would be relevant under HIPAA. *See, e.g.*, 42 U.S.C. § 1320d-6 (2006) (making it an offense for a person knowingly to "obtain[] individually identifiable health information relating to an individual" in violation of the statute); *Johnson v. Quander*, 370 F. Supp. 2d 79, 99 (D.D.C. 2005) ("The HIPAA . . . provides for civil and criminal penalties for individuals who improperly *handle* or disclose individually identifiable health information." (emphasis added)), *aff'd*, 440 F.3d 489 (D.C. Cir.), *cert. denied* 127 S. Ct. 103 (2006). Unfortunately for plaintiff, HIPAA "specifically indicates that the

Secretary of [Health and Human Services] shall pursue the action against an alleged offender, not a private individual." *Id.* at 100; *see, e.g.*, *Barnes v. Glennon*, No. 05-0153, slip op. at 5 (N.D.N.Y. Sept. 28, 2006) ("Congress clearly provided a remedy within the statute when there is wrongful disclosure, as evidenced by the possible imposition of monetary sanctions and criminal penalties [under 42 U.S.C. § 1320d-6(b)] by the Secretary of [Health and Human Services] or the State."). Moreover, courts uniformly agree that there is no implied right of action under HIPAA for private individuals. *Johnson*, 370 F. Supp. 2d at 100; *see, e.g.*, *id.* (collecting cases); *Logan*, 357 F. Supp. 2d at 155 (citing *O'Donnell v. Blue Cross Blue Shield of Wyo.*, 173 F. Supp. 2d 1176, 1179–80 (D. Wyo. 2001)).[2] Thus, to the extent that plaintiff premises his claim on the theory that Commander Sokolowski improperly accessed his medical record, plaintiff is asking this Court to recognize under the Privacy Act a private right of action that Congress has expressly denied under HIPAA. Such an interpretation of the Privacy Act would be inconsistent with both HIPAA and the Privacy Act's plain language, and, thus, it must be rejected. *Cf. Kleiman*, 956 F.2d at 338 (declining to authorize, "under the aegis of the Privacy Act or otherwise, district court review of personnel decisions judicially unreviewable under the [Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111 (codified throughout Title 5, U.S.C.)]").

Accordingly, plaintiff is required to show that Commander Sokolowski "disclosed" a "record" contained within a "system of records," that the disclosure was improper, that "the disclosure was willful or intentional," and that "the disclosure adversely affected plaintiff."

---

[2]Consistent with this uniform interpretation of HIPAA, a recent bill proposing amendments to the statute would not create a private right of action for the improper use of personal health information, even though the same bill proposes to create a private right of action for other kinds of privacy infringements. *Compare* PROTECT Act, S. 3713, 109th Cong. § 13 (2006) (as introduced in the Senate on July 20, 2006), *with id.* § 2.

*Logan*, 357 F. Supp. 2d at 154.  For the reasons explained below, all of Commander Sokolowski's disclosures were either proper or caused no adverse effect.[3]

### A.     Improper Disclosure

As already explained, the Privacy Act contains an exception authorizing the interagency disclosure of protected records "to those officers and employees . . . who have a need for the record[s] in the performance of their duties."  5 U.S.C. § 552a(b)(1).  The need-to-know exception justified Commander Sokolowski's disclosures to Captain Taylor, Commander Andres, Lieutenant Jarvi, and Commander Gordon.[4]

#### 1.     Disclosures to Captain Taylor and Commander Andres

The need-to-know exception permits the disclosure of a person's protected record to a supervisor who needs information contained in the record to assess the person's trustworthiness

---

[3]Defendant further contends that, in disclosing plaintiff's failure to report flight-disqualifying health problems, Commander Sokolowski did not disclose a "record" within a system of records.  (*See* Reply at 1–3; Resp. to Surreply at 2–4.)  Because defendant is entitled to summary judgment on other grounds, the Court need not decide the novel issue of whether a disclosure of the *absence* of information from a system of records can constitute the disclosure of a record within the meaning of the Privacy Act.  Nonetheless, the Court cannot help but observe that, on the facts of this case, the government's position has substantial common-sense appeal.  If plaintiff had reported his medical condition and use of medication as he was required to do [redacted] - - instead of concealing that material information - - plaintiff's flight-disqualifying health problems would unquestionably have become part of a record within a system of records.  (*See* DD Form 2807-1 §§ 8, 23, 24, 29.)  In that event, these health problems would have come to the attention of plaintiff's superior officers far sooner.  Given that plaintiff deliberately attempted to prevent the Coast Guard from maintaining a record of his health problems, accepting plaintiff's characterization of his failure to report them as itself constituting a record that is afforded protection by the Privacy Act would stretch the meaning of the statute beyond its intended purpose, as well as permit plaintiff to flout the Coast Guard's system for qualifying flight personnel.

[4]Because defendant does not invoke Section 552a(b)(1) to justify Commander Sokolowski's disclosure to [redacted], the Court does not address [redacted] need to know.

11

and make related personnel decisions.  *See, e.g.*, *Bigelow*, 217 F.3d at 370 (agreeing with the Department of Defense that the plaintiff's "immediate supervisor," who had concerns about the plaintiff's trustworthiness, had a need to review the plaintiff's personnel security file to verify those concerns); *Blazy v. Tenet*, 979 F. Supp. 10, 26 (D.D.C. 1997) ("The CIA also had the authority to disclose the status of plaintiff's security investigation to his supervisor because he had a 'need for the record[s] in the performance of [his] duties." (alterations in original)), *aff'd*, 1998 WL 315583, at *1 (D.C. Cir. May 12, 1998) (per curiam); *Mount v. U.S. Postal Serv.*, 79 F.3d 531, 533–34 (6th Cir. 1996) (holding that the plaintiff could not establish that his protected medical records were willfully disclosed to "employees or agents of the [agency] with responsibilities for making employment and/or disciplinary decisions" about him when those people "had at least an arguable need to access the information in [his] medical records"); *Hass v. U.S. Air Force*, 848 F. Supp. 926, 932 (D. Kan. 1994) ("[T]he report of plaintiff's mental health evaluation may have been disclosed to certain Air Force officers who ultimately made the decisions to revoke plaintiff's security clearance and to discharge her.  These officers obviously had a need to review this document so that they could make an informed decision regarding plaintiff's future with the Air Force.").

      Here, Captain Taylor and Commander Andres were Air Station Miami's highest-ranking officers.  (Def.'s Mem. in Supp. at 14.)  They were responsible for ensuring that the air station was operating safely and in accordance with the Coast Guard's medical guidelines.  (*Id.*; *see* Def.'s Ex. B ["Aviation Med. Man."] at art. 1.D.1.)  They had supervisory and disciplinary authority over plaintiff.  (*See, e.g.*, Cmpl. ¶¶ 18–20, 22–23, 26, 31 (listing some of the investigatory and disciplinary actions taken or initiated by Captain Taylor).)

The Court is persuaded by defendant's argument that, under such circumstances, Captain Taylor and Commander Andres had a need to know the information that was disclosed by Commander Sokolowski. (*See* Def.'s Mem. in Supp. at 14.) In fact, nowhere in plaintiff's pleadings does he even contest defendant's argument. (*See, e.g.*, Opp. at 20–28 (addressing the other officials' need to know without rebutting defendant's argument as to Captain Taylor or Commander Andres).) Accordingly, there was no improper disclosure to either Captain Taylor or Commander Andres.

### 2. Disclosure to Lieutenant Jarvi

As the parties agree, the Coast Guard's Aviation Medical Manual authorizes a "medical officer" to recommend that a commanding officer "relieve from flying duty or suspend the flight training of an individual deemed unfit for such duty." (Aviation Med. Man. at art. 1.D.1.) Here, Lieutenant Jarvi was plaintiff's treating medical officer. (*E.g.*, Def.'s Mem. in Supp. at 6.) Plaintiff himself concedes that, as plaintiff's treating medical officer, Lieutenant Jarvi had a need to know the information disclosed by Commander Sokolowski. (*See* Opp. at 17 ("At best, upon learning of discrepancies in [plaintiff's] medical record, [Commander] Sokolowski was only authorized to bring the discrepancies to the attention of [plaintiff] *or his medical provider, [Lieutenant] Jarvi*." (emphasis added)).) Accordingly, it is undisputed that there was no improper disclosure to Lieutenant Jarvi.

### 3. Disclosure to Commander Gordon

Defendant contends that Commander Gordon had a need to know the information Commander Sokolowski disclosed to him in his capacity as both quality assurance coordinator for Air Station Miami's clinic and acting chief of its Health Services Division. (*See* Def.'s Mem.

in Supp. at 13; Reply at 5.) Plaintiff argues that Commander Gordon "had no reason to know of [plaintiff's] medical information for the performance of his duties either as the coordinator of QA reviews or as a dental care provider." (Opp. at 24.) However, plaintiff does not refute that, as acting chief of the air station's Health Services Division, Commander Gordon needed to know that an active flight surgeon had failed to disclose health problems that could potentially disqualify him from flight status. (*See id.*) In Commander Gordon's capacity as acting chief of the Health Services Division, as well as his capacity as a "medical officer," it was well within the scope of his duties to determine whether to recommend that a commanding officer "relieve from flying duty . . . an individual deemed unfit for such duty." (Aviation Med. Man. at art. 1.D.1.) Accordingly, Commander Gordon had a need to know the information Commander Sokolowski disclosed.

In sum, because Captain Taylor, Commander Andres, Lieutenant Jarvi, and Commander Gordon needed to know the information that Commander Sokolowski disclosed, Commander Sokolowski's disclosures to those officers did not violate the Privacy Act.

**B.    Adverse Effect**

Similarly, Commander Sokolowski's disclosure to [redacted] did not violate the Privacy Act because it caused plaintiff no adverse effect. Plaintiff does not (and could not) dispute that he learned of Commander Sokolowski's statements to [redacted] only after initiating the present action. (*E.g.*, Reply at 6.) Accordingly, as a matter of law, plaintiff cannot prove that he suffered emotional harm from Commander Sokolowski's statements to [redacted]. It is equally obvious that plaintiff did not suffer any pecuniary harm from Commander Sokolowski's statements to [redacted], because no administrative action against plaintiff resulted from those statements.

[Redacted.]  (Def.'s Ex. 7 at 1.)[5]

---

[5]Because there was no improper disclosure to Lieutenant Jarvi, Commander Gordon, Captain Taylor, or Commander Andres, the Court need not consider whether Commander Sokolowski's disclosures to those officials adversely affected plaintiff.  Nonetheless, it is noteworthy that in plaintiff's declaration he does not claim to have suffered psychological distress from any of those disclosures.  (*See* Cacho Decl. ¶¶ 9–11.)  Rather, plaintiff declares that it upset him to know that Commander Sokolowski had *accessed* his medical record in the first place.  (*See id.* ¶ 9 ("I was extremely distressed to learn that [Commander Sokolowski had *accessed* my entire medical record . . . ." (emphasis added)); *id.* ¶ 10 ("I was shocked that [Commander] Sokolowski *had access to* and probably knew of every medical condition including sensitive personal diagnoses and symptoms I had been treated for during the course of my career.  I felt that my most valuable rights to privacy and physician-patient confidentiality had been intruded on by someone who had no right or need to know . . . the information contained in my medical record." (emphasis added)).)  Plaintiff's declaration again reveals a desire to recast a HIPAA violation as a Privacy Act violation, and this time his misplaced emphasis on Commander Sokolowski's review of his medical record leads him to ignore the Privacy Act's requirement that an improper disclosure cause an adverse effect.  Additionally, it bears mention that any harm plaintiff suffered from the administrative actions taken against him is not actionable under the Privacy Act.  *See, e.g.*, *Albright v. United States*, 732 F.2d 181, 190 (D.C. Cir. 1984) ("While we understand the distress possibly suffered by the [plaintiffs] in response to this administrative reclassification of their jobs, the Privacy Act was not intended to shield these employees from the vicissitudes of federal personnel management decisions."); *see also Mandel v. U.S. Office of Pers. Mgmt.*, 244 F. Supp. 2d 146, 153 (S.D.N.Y. 2003) (concluding that the plaintiff had failed to establish a causal nexus between the alleged improper disclosure and the alleged emotional distress and pecuniary loss because "the plaintiff's falsification [on a job application], in and of itself, was sufficient to support [the agency's] unsuitability determination").

15

**CONCLUSION**

For the foregoing reasons, plaintiff cannot make a claim under the Privacy Act for *disclosures* by Commander Sokolowski, and, therefore, the Court will award summary judgment for defendant.

_____s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: November 27, 2006